UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STELLA HAWK,

     Plaintiff,

vs.                                                      Case No. 12-11422

CHRYSLER GROUP LLC                        HON. AVERN COHN
and CHRYSLER GROUP LLC -
UAW PENSION PLAN,

     Defendants.

_____/

**MEMORANDUM AND ORDER GRANTING DEFENDANTS'
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. 8)**

## I. INTRODUCTION

This is a denial of benefits case under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132.  Plaintiff Stella Hawk (Hawk), an ERISA plan participant, brought this action challenging the denial of permanent total disability retirement (PTD retirement) by defendant Chrysler Group LLC - UAW Pension Plan (Plan).  The Plan is sponsored by Chrysler Group LLC (Chrysler), Hawk's employer.  Now before the Court is Chrysler's motion for judgment on the administrative record (Doc. 8).  For the reasons that follow, the motion will be granted.

## II. BACKGROUND

Hawk says she is totally disabled based on a diagnosis of major depression.

Hawk began working for Chrysler when she was nineteen years old and is now forty-five years old.  She applied for benefits under the Plan, an ERISA governed plan that provided for PTD retirement; the application was denied.  She claims the decision to deny

PTD retirement was arbitrary and capricious.

## A. The Plan

The Plan is sponsored by Chrysler and administered by the Board of Administration (Board), comprising of three Chrysler members and three union members (Doc. 7, p. 55). Sedgwick Claims Management Services, Inc. (Sedgwick) processes administrative claims under the Plan; the Board reviews and makes final determinations of an employee's appeal for benefits (Doc. 8, p.2 n. 2).  The Plan  gives the Board discretion "to interpret the Plan and determine eligibility for and the amount of benefits in accordance with the terms of" the Plan (Doc. 7, p. 56).  Decisions by the Board are "final and binding on the Union and its members, the employee or employees or former employee or employees involved, and on [Chrysler]" (Id. at 58) "unless it can be shown that the interpretation or determination is arbitrary and capricious" (Id. at 56).

Section 8 of the Plan governs pension for employees who are permanently and totally disabled (Id. at 21).  The Plan addresses permanent disability as follows:

> An employee shall be deemed to be permanently and totally disabled only if he is not engaged in regular employment or occupation for remuneration or profit and the Board of Administration shall find, on the basis of medical evidence
>
> (a) that he has been totally disabled by bodily injury or disease so as to be prevented thereby from engaging in regular employment or occupation with the Corporation at the plant or plants where he has seniority for remuneration or profit, and
>
> (b) that his total disability will be permanent and continuous during the remainder of his life. . . .
>
> In any case where the Board of Administration is required to make a finding with respect to the permanent total disability of any employee applying for . . . permanent total

2

disability, the employee . . . first shall be required to submit to an examination by a physician who shall have been appointed for this purpose by the Corporation for his medical opinion whether the employee has been totally disabled, whether the employee's total disability has existed continuously for a period of at least five consecutive months and whether the employee's total disability will be permanent and continuous during the remainder of his life, and if requested by the Board of Administration, also by a physician selected by the Board of Administration who shall be paid from the Pension fund. The employee will be required to submit to such re-examinations as shall be necessary for the Board of Administration to determine whether he is permanently and totally disabled, and, when relevant, whether the disability has existed continuously for a period of at least five consecutive months. The medical opinions of such physician or physicians shall decide the question and shall be binding upon the Board of Administration which shall thereupon make its finding in accordance with such opinions. If such physicians shall disagree concerning whether the employee is permanently and totally disabled or on the duration of such disability, that question shall be submitted to a third physician appointed by such two physicians. . . .

(Id. at 22-23).

## B. The Administrative Record

The Court has reviewed the administrative record and outlines it below.

### 1. Pre-application[1]

In August of 2010, Hawk took a leave of absence due to "[m]ajor depression, recurrent, moderate" (Doc. 7-3, p. 69). She sought temporary leave benefits. Hawk's treating psychiatrist, Dr. Niemisto,[2] opined that Hawk was unable to work from August 25, 2010 until October 25, 2010 (Id.). Dr. Niemisto noted that Hawk had a history of major

---

[1] Hawk treated with Dr. Xavier White in 2001. Dr. White's treatment records do not shed light on whether Hawk is currently permanently and totally disabled.

[2] Dr. Niemisto worked at Center for Healing & Happiness, PC.

3

depression, that it was in remission, and that Hawk relapsed (Id. at 70).

On September 17, 2010, Hawk was examined by Dr. Kezlarian, an independent

examiner picked by Sedgwick (Doc. 7-3, p. 43).  After a mental status examination, Dr.

Kezlarian noted the following:

> Examination revealed an alert and agitated lady.  She is quite
> angry and resentful.  She sat throughout the interview with
> excellent eye contact.   Cognition was grossly intact.
> Sensorium was clear.  Speech was somewhat dramatizing but
> goal directed and coherent.  She was easily agitated when she
> described how they were "trying to fire her."  There was no
> evidence of hallucinations.  She denied active or true homicidal
> or suicidal ideation, plan or intent.  There was no evidence of
> psychosis.  She denied hallucinations or delusions.

(Id. at 48).  Dr. Kezlarian further stated, "This is a mildly abnormal mental status exam in

a lady who is obviously having personality conflicts with her supervisor" (Id. at 49).  Dr.

Kezlarian's diagnosis was "adjustment disorder with mixed emotional features, not

considered disabling" (Id.).  In sum, Dr. Kezlarian concluded,

> The examinee relates in a way that is quite disgruntled but
> does not have evidence of any disabling psychiatric condition.
> Clearly, she needs to build new coping skills in dealing with her
> personality conflicts at work and also her tardiness.  However,
> her symptoms and mental status exam are insufficient to
> establish a disabling psychiatric condition.  She is judged to be
> fit for the field of general common labor and able to return to
> work without any limitations from a psychiatric standpoint.

(Id. at 49-50).

Hawk returned to work on September 20, 2010; she was sent home for having high

blood pressure.  Hawk reported to Dr. Niemisto on September 21, 2010 and informed Dr.

Niemisto that she was sent home from work for having high blood pressure (Id. at 25).  She

told Dr. Niemisto that she "wants to hit people [at] work, if they ever smirk [at] her or mess

4

with her" (Id.).  Dr. Niemisto noted that Hawk had stopped taking her proscribed Celexa two weeks prior because she was confused about Dr. Niemisto's prior directions (Id.).  In concluding, Dr. Niemisto determined that Hawk was "unable to work [at] this time" (Id.).

Hawk visited Dr. Niemisto again on September 29, 2010 (Id. at 27).  Dr. Niemisto assessed Hawk as having "recurrent depression" (Id.).  The administrative record shows that Hawk continued to see Dr. Niemisto and her therapist, Dr. Parker,[3] on a bi-weekly basis through December of 2010, and her medications were continuously adjusted see (Id. at 28-42).  From October 28, 2010 to November 2, 2010, Hawk voluntarily admitted herself to Harbor Oaks Inpatient Psychiatric Unit.  She continued to see Dr. Niemisto and Dr. Parker after her release.

On January 24, 2011, Hawk underwent another independent medical examination in support of her claim for temporary leave benefits.  Dr. Wolf, a doctor picked by Sedgwick, examined Hawk and determined that she had "bipolar disorder, type I" (Id. at 61).  Dr. Wolf stated,

> In my opinion, Stella Hawk most likely has bipolar disorder, which has thus far not been successfully treated.  She reports a history of a persistent intermediate insomnia and presented in clinical interview with labile mood, anger and mild explosiveness in a manner which suggests a bipolar diagnosis. In my judgment, she is currently incapable of returning to work in a safe and effective manner.  I suspect that she has a thought disorder characterized by paranoia and, based upon the information currently available to me, I am not of the opinion that her mood disorder is a result of workplace experience.  She is in the process of an up titration of her Lamictal.  In my judgment, another mood stabilizer such as Depakote or Lithium would be a better choice.

---

[3] Dr. Parker was a therapist working at Center for Healing & Happiness, PC with Dr. Niemisto.

5

> If Ms. Hawk has not returned to work in six weeks, I would
> recommend re-evaluation.

(Id.).

Hawk was re-evaluated by Dr. Wolf on May 2, 2011 (Id. at 62). Dr. Wolf diagnosed Hawk with "bipolar disorder type I, moderately severe with psychotic features, rule out schizoaffective disorder, bipolar type" (Id.). Dr. Wolf stated that, "[i]n my judgment, [Hawk's] psychotropic regimen is excessive" (Id.). Thus, he recommended a change in her medicine. He concluded, "Under the current treatment regime, it is difficult to predict when, if ever, Ms. Hawk will be capable of returning to work. The picture here is complicated by the fact that she has no desire whatsoever to do so. Her excessive medication provides at least as much of a barrier to return to work as does her psychiatric illness" (Id.).

## 2. Post-application

Hawk applied for PDT retirement on May 2, 2011, due to major depression and anxiety, seeking a May 31, 2011 date of retirement (Doc. 7-2, p. 28). In support of Hawk's application, Dr. Niemisto stated that Hawk had "[m]ajor depression, severe, recurrent/General Anxiety Disorder" and that her conditions were not likely to respond to known treatment (Id. at 28-29). Further, Dr. Niemisto stated Hawk "is distraught, unable to trust, overwhelmed, poor function, anger" (Id. at 29).

On May 18, 2011, Chrysler had Dr. Morris, a Sedgwick doctor, review Hawk's application and medical records (Id. at 30). Dr. Morris opined that Hawk had "major depression per treating physici[an], bipolar disorder type I, moderately severe with psychotic features, possible schizoaffective disorder, bipolar type, per IME [independent medical evaluation]" (Id.). Dr. Morris opined that Hawk was temporarily totally disabled and that she may improve with change in medication and treatment (Id. at 31).

6

The Board requested Hawk undergo another independent medical evaluation.  On June 2, 2011, Hawk saw Dr. Friedman, another doctor picked by Sedgwick, for an independent medical examination to determine whether her depression and anxiety amounted to permanent and total disability (Doc. 7-3, p. 51).  Dr. Friedman diagnosed Hawk as follows:

> Axis I: Mood Disorder, with depression.
>      Adjustment Disorder, with anxiety and depression.
>
> Axis II: Histrionic Personality Disorder.
>
> Axis III: Hypertension, by history, treated.
>       Acid reflux disease, by history, treated.
>
> Axis IV: Intense anger and resentment toward the Human
>       Relations Department at Chrysler Corporation, as well
>       as former supervisors and coworkers.
>
> Axis V: GAF: 55

(Id. at 55).  He noted that he "found no evidence for any type of association defect or thought disorder.  There were no signs of hallucinations, delusions, illusions, or referential thinking. . . She denied having suicidal thoughts or urges, but several times did allege that she has such anger that she could shoot those people she worked with who she believes were harassing her" (Id.).  Dr. Friedman concluded that, "[b]ased on today's clinical examination and review of records it is my opinion that Ms. Hawk is not eligible for Permanent and Total disability retirement as it pertains to the diagnosis of Major Depression, severe recurrent and general anxiety disorder" (Id. at 56).

On June 23, 2011, Hawk's application for PTD retirement was denied (Doc. 7-1, p. 69).  The denial letter stated, in pertinent part,

> A review of the medical information received relative to your

7

situation reveals that although your personal physician considers your condition to be permanently and totally disabling for the rest of your lifetime, the Corporation physician does not.   The Pension Plan requires both the personal physician and the corporation physician to conclude that your condition is permanently and totally disabling.   If both physicians disagree that your condition is permanently and totally disabling for the rest of your lifetime, the Pension plan provides that you shall be required to submit to a re examination (independent medical examination - IME) by a third physician, and his decision is binding.

You had an independent medical evaluation on June 2, 2011. As a result of this examination, the examining physician, Dr. Howard Friedman, indicated that your condition does not appear to be permanently and totally disabling for the remainder of your lifetime.

On the basis of the medical evidence submitted, it has been determined that you are not permanently and totally disabled as is required under, Section (8) of the Pension Plan. Therefore, you are not eligible for a PTD retirement and your application must be denied.   You may reapply for a PTD retirement at any time.

(Id.).  Further, the letter informed Hawk that she had 180 days to file a written appeal (Id.).

On July 13, 2011, Hawk sent a letter to the Board appealing its decision (Doc. 7-3, pp. 3-4).  In the letter, Hawk claimed the PTD retirement decisions process was tainted by a structural conflict of interest (Id. at 3).  Specifically, the letter stated that, "[t]he Board should be aware that Ms. Hawk has a workers['] compensation claim pending against Chrysler Corporation.  This claim is being administered and managed by Sedgwick CMS. The workers['] compensation claim alone gives Chrysler and Sedgwick the motivation to oppose Ms. Hawk's PTD claim" (Id.).   The letter further stated that "[t]he only truly independent doctor is Ms. Hawk's treating psychiatrist.  She obtains no financial gain by giving her opinion in this matter.  She has seen and treated Ms. Hawk over a period of

several months unlike the Sedgwick[] doctors who evaluated Ms. Hawk on one or possibly

two occasions" (<u>Id.</u> at 4).

As part of the appeals process, Hawk's claim was referred to Dr. Givens, a doctor

picked by Sedgwick, for a file review (<u>Id.</u> at 13).  Dr. Givens was unsuccessful in contacting

Dr. Niemisto and Dr. Parker as part of the file review (<u>Id.</u> at 13-14).  After reviewing Hawk's

medical records, Dr. Givens concluded that she was not permanently and totally disabled

for the remainder of her life:

> **RATIONALE:** There is insufficient objective evidence of
> cognitive dysfunction that would prevent Stella Hawk from
> working.  No specific testing of cognitive functioning is
> documented in the records as noted above in the psychiatry
> synopsis.  There is a lack of ongoing suicidal or homicidal
> intent or plan, delusions or hallucinations.  Memory was
> reported to be unimpaired for immediate, recent, and remote.
> There is insufficient objective evidence to support significant
> impairment in activities of daily living as a result of a psychiatric
> disorder.  There is insufficient evidence to support that Stella
> Hawk would be permanently and totally disabled for the
> remainder of her lifetime.

(<u>Id.</u> at 16).  Dr. Morris's progress notes were later given to Dr. Givens and he supplemented

his report, with the same conclusion (<u>Id.</u> at 18-19).

On August 25, 2011, the Board denied Hawk's appeal (Doc. 7-1, pp. 65-66).

On March 29, 2012, Hawk filed this lawsuit (Doc. 1).

### III. STANDARD OF REVIEW

A district court reviews an ERISA plan administrator's denial of benefits <u>de novo</u>,

unless the plan administrator has discretionary authority to determine eligibility for benefits.

<u>Cox v. Standard Ins. Co.</u>, 585 F.3d 295, 299 (6th Cir. 2009).  Where, as here, the plan

gives the administrator discretionary authority, a district court must apply the highly

deferential "arbitrary and capricious" standard of review.  Fahrner v. United Transp. Union Discipline Income Prot. Prog., 645 F.3d 338, 343 (6th Cir. 2011).  "The arbitrary and capricious standard is the least demanding of judicial review of administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."  Schwalm v. Guardian Life Ins. Co. Of Am., 626 F.3d 299, 308 (6th Cir. 2010) (quoting Shields v. Reader's Digest Ass'n, Inc., 331 F.3d 536, 541 (6th Cir. 2003)).  Under the arbitrary and capricious standard of review, a district court must "uphold the administrator's decision if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence."  Helfman v. GE Group Life Assur. Co., 573 F.3d 383, 392 (6th Cir. 2009) (citing Bennett v. Kemper Nat'l Servs., Inc., 514 F.3d 547, 552 (6th Cir. 2008) (internal quotation marks omitted)). Notwithstanding, the arbitrary and capricious standard is not a "rubber stamp [of] the administrator's decision."  Kovach v. Zurich Am. Ins. Co., 587 F.3d 323, 328 (6th Cir. 2009) (citation and internal quotation marks omitted).  Rather, a district court must review "the quality and quantity of the medical evidence and the opinions on both sides of the issues." McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003).

## IV. DISCUSSION

The Plan[4] says it entitled to judgment as a matter of law because the decision to deny Hawk's benefits was neither arbitrary nor capricious.  The Plan points to the independent medical evaluations and additional file review that concluded Hawk was not

---

[4] Throughout her papers, Hawk refers to the Plan and Chrysler interchangeably. However, the Plan is the true defendant.  Hawk served the Plan, and not Chrysler, with the summons.

permanently and totally disabled.  According to the Plan, the Board's decision is entitled to deference because it is supported by the available medical evidence.

Hawk says the administrative record clearly supports a finding that she is permanently and totally disabled.  Hawk claims it was arbitrary and capricious for Dr. Morris to conclude that she was not permanently and totally disabled without ever speaking to Dr. Niemisto or Dr. Parker.  Hawk's varied objections can be organized into two general categories.  First, she argues that the Plan's doctors were biased and operating under a structural conflict of interest, which unfairly influenced the Board's decision.  Second, she says the Plan administrators selectively relied on the medical evidence that supported denial of Hawk's claim.

Hawk concedes that the Plan grants the Board discretionary review, and, therefore, the Court applies the "arbitrary and capricious" standard of review.  In so doing, the Court cannot conclude that Chrysler's decision to deny Hawk's benefits was arbitrary and capricious.

## A. Conflict of Interest

Hawk says there was a structural conflict of interest in the administration of her PTD retirement claim because Sedgwick processed both her workers' compensation claim and her claim for PTD retirement.  She says that Sedgwick picked the psychiatrists who examined Hawk and that "[i]t is hard to ignore the business and financial relationship between these physicians and Sedgwick. . ." (Doc. 10, p. 14).  Hawk further states that "Chrysler is the company not only making the decisions in the claim process but is also the entity paying the claim, choosing the IME physicians and compensating those physicians. Accordingly, it is clear that a conflict of interest arises for which less deference should be

11

given to the claims administrator." The Court disagrees.

As the Plan correctly notes, pension benefits are paid by the Plan, not by Chrysler itself. Chrysler is the plan sponsor and Sedgwick processes the claims. Ultimately, the independent Board makes a final decision. Therefore, the typical structural conflict of interest is not present. See, e.g., Hunter v. Life Ins. of North Am., 437 F. App'x 372, 376 (6th Cir. 2011) ("This court has recognized that a conflict of interest exists when the insurer both decides whether the employee is eligible for benefits and pays those benefits.") (citing Gismondi v. United Techs. Corp., 408 F.3d 295, 299 (6th Cir. 2005).

Further, even assuming the arrangement here created a structural conflict of interest, the existence of a structural conflict of interest does not heighten the standard of review. It is "but one factor among the many that a reviewing judge must take into account." Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 116 (2008). "The reviewing court looks to see if there is evidence that the conflict in any way influenced the plan administrator's decision." Hunter, 437 F. App'x at 376 (citing Carr v. Reliance Standard Life Ins. Co., 363 F.3d 604, 606 n.2 (6th Cir. 2004)). Here, there is no evidence to show that, if there was a structural conflict of interest, it influenced the Plan's decision to deny benefits. To the contrary, the Board is comprised of three Chrysler members and three union members. This deliberate setup appears to ensure that claims are fairly decided. In addition, the decision to deny Hawk's benefits came only after Dr. Wolf and Dr. Friedman conducted independent medical examinations of Hawk. See, e.g., Calvert v. Firstar Finance, Inc., 409 F.3d 286, 295 (6th Cir. 2005) (reasoning that whether a doctor has physically examined a claimant is a factor that the court may consider in determining whether denial of benefits was arbitrary and capricious). The Board provided a reasoned

12

explanation, based on the evidence, for denial of Hawk's benefits.  Thus, there was no structural conflict of interest that influenced the Plan's denial of Hawk's PTD retirement benefits.

### B. Selective Reliance on Medical Evidence

Hawk claims the Board selectively relied on the evidence even though Dr. Niemisto, Dr. Morris and Dr. Wolf all opined that Hawk was temporarily disabled.  Further, Hawk takes issue with Dr. Givens's failure to consult with her treating psychiatrist and therapist before arriving at his decision that Hawk was not permanently disabled.

Hawk fails to recognize that, with the exception of Dr. Niemisto's statement in support of Hawk's application for PTD retirement, no doctor has opined that Hawk was permanently and totally disabled.  Instead, the doctors all opined that Hawk was temporarily disabled.  Hawk underwent multiple independent medical evaluations where she was physically examined in furtherance of her claim for PTD retirement.  Further, after an administrative appeal, Dr. Givens conducted a file review.  Dr. Givens, having the benefit of reviewing Hawk's entire file, stated that there was insufficient objective evidence establishing that Hawk was permanently and totally disabled.  Dr. Wolf's independent medical evaluation prior to Dr. Givens's file review revealed that it was difficult to determine whether Hawk would be able to return to work due, in part, to her (1) excessive medications and (2) lack of desire to return to work.  As the Sixth Circuit has explained,

> Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision.

13

<u>McDonald v. Western-Southern Life Ins. Co.</u>, 347 F.3d 161, 170 (6th Cir. 2003) (citations omitted). Here, the plan administrator relied on several doctors who agreed that Hawk was temporarily, but not permanently, disabled. Hawk was physically examined by psychiatrists through several independent medical examinations and the decision to deny benefits was not based simply on a file review.

Nothing in the administrative record shows that the decision to deny benefits was based on a selective evaluation of the evidence. Rather, each doctor recognized that Hawk was temporarily disabled. However, it was ultimately determined that the disability was only temporary, and that Hawk's condition could be improved by a change in medication. Further, Hawk's lack of a desire to return to work was listed as an impediment to a proper finding of total disability. Thus, it appears from the administrative record that the Board relied on the totality of the medical evidence before arriving at its decision.

Hawk confuses the issue before the Court. At oral argument, Hawk's attorney argued that Dr. Niemisto's opinion coupled with the opinions of the Plan doctors establish that Hawk is disabled. The issue before the Court, however, is not whether Hawk is currently disabled. The Court must decide whether the plan administrator's denial of PTD retirement was arbitrary and capricious. It was not. Further, Hawk's attorney argued that Hawk's treating psychiatrists were in a better position to determine whether she was permanently disabled. As the Supreme Court has recognized, ERISA does not "require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834 (2003). Rather, ERISA

14

precludes plan administrators from "arbitrarily refus[ing] to credit a claimant's reliable evidence, including the opinions of a treating physician." Id. Here, Dr. Niemisto's opinion was not arbitrarily discredited.  Independent medical examinations were performed and the examiners disagreed with Dr. Niemisto's opinion as to permanent and total disability. Accordingly, the Plan's reliance on other doctors who had different opinions than Dr. Niemisto was not arbitrary and capricious.

### V. CONCLUSION

For the reasons stated above, defendants' motion for judgment on the administrative record is GRANTED.  The Court's review of the administrative record shows that the decision to deny benefits was not arbitrary and capricious.

SO ORDERED.

 S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated:  January 14, 2013


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, January 14, 2013, by electronic and/or ordinary mail.

 S/Sakne Chami
Case Manager, (313) 234-5160

15